Anthony AKERS, et al., Plaintiffs,

v.

Merle R. BOLTON, Commissioner of Education for the State of Kansas, et al., Defendants.

Civ. No. 80–1112.

United States District Court, D. Kansas.

Nov. 13, 1981.

Robert L. Feldt, Great Bend, Kan., for plaintiffs.

Erle W. Francis, Topeka, Kan., Mary Kathleen Babcock, Daniel J. Sevart, Wichita, Kan., for defendants.

## MEMORANDUM AND ORDER

KELLY, District Judge.

This most provocative case has been fully tried to the Court, and is now ready for decision. It has been brought by plaintiffs Anthony Akers and Philip Moore, and their parents, on behalf of a putative class of all epileptic school-aged children in the State of Kansas. Plaintiffs seek to have that class certified pursuant to Rule 23 of the Federal Rules of Civil Procedure, and seek injunctive relief on behalf of the class against the Kansas Commissioner of Educa-tion and against the Superintendent of Unified School District No. 259, Wichita, Kansas. In brief, plaintiffs contend that defendants' policies and practices violate both individual and class rights to a "free appropriate public education" that are granted by the Education for All Handicapped Children Act, 20 U.S.C. § 1401 *et seq.*, (EAHCA); by Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; by the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the Constitution; and by the Kansas Special Education for Exceptional Children Act, K.S.A. 72–961 *et seq.*

In particular, plaintiffs suggest that the school district's Comprehensive Plan for the Education of Exceptional Children (Def. Ex. MM) is insufficient to accomplish the intended goals of the EAHCA, and should be revised to require that each school child be screened for epilepsy, that each epileptic child be evaluated for possible educational deficits attendant upon his or her epilepsy, that specific optional educational programs be made available as a matter of course to epileptic children, and that these programs be designed in consultation with experts knowledgeable as to both the neurological and educational aspects of epilepsy. While plaintiffs do not voice any particular criticism of the Kansas Plan for Special Education (Def. Ex. G), they do contend that the commissioner has insufficiently enforced that plan's identification, screening and evaluation requirements against the local school districts.

In this regard, although he admits that the respective plaintiffs suffer from epilepsy, the commissioner opposes plaintiffs' position, insisting that the State Plan for Special Education has at all times been in conformity with the requirements of the EAHCA and enforced it against the local districts. He suggests that the plan requires that school-aged children be screened and identified so that, where necessary, an individual educational program (IEP) may be developed, thus allowing handicapped children, including those who are epileptic, a free, appropriate public education. Fur-

ther, he contends that to aid in the development of the IEP the state has gone to great lengths to establish a procedure known in educational parlance as "due process," whereby input from the student involved, parents, educators, and other persons, including psychologists, psychiatrists, physicians, therapists, etc., are received by a local district. From the information received, an IEP is drafted to meet the needs of the individual student. The commissioner claims that the procedures established call for notice and an opportunity to be heard, and fulfill both the spirit and the intent of the EAHCA.

Most specifically, the commissioner urges that a student suffering from epilepsy does *not*, by that reason alone, necessarily require either special education or related services. In this, such a student might best be placed into the education system with other nonhandicapped students (mainstreamed), or the student might have some learning disability that would require development of an IEP. Simply stated, the commissioner urges that each plaintiff or any student is to be assessed as an individual and that a stereotypical classification should not satisfy Rule 23 nor mandate injunctive relief.

Similarly, U.S.D. 259 excepts to the plaintiffs' contentions and also urges a finding of reasonable and appropriate compliance with the federal and state mandates; it claims that it vigorously supports a program of screening, identification and evaluation of students suspected to be in need of special education.

The Court has previously taken plaintiffs' motion for class certification under advisement, and over objections of the defendants has heard that case in concert with the claim for injunctive relief, conducting a full evidentiary hearing as to all aspects of their claims, and thereby obtaining some appreciation of the application of the referred acts and plans.

Upon completion of presentation of plaintiffs' evidence, the Court overruled the defendants' respective motions for dismissal, impressed in part as to the importance and impact of plaintiffs' thesis. Indeed, this is a case that should have been heard, if for no other reason than to permit articulation of the plight of those so afflicted and to test the propriety of the present law and its implications. Certainly, the sharp focus of the issues through most persuasive and well-prepared counsel—both sides—has been of considerable benefit in the Court's effort to reach decision. Indeed, the thrust of the plaintiffs' evidence is deserving of review.

Epilepsy is not a single, well defined condition, but varies among individuals as to its symptoms and effects. People with epilepsy have sudden, recurrent, episodic disturbances in the normal patterns of electrical activity in the brain; these disturbances are associated with characteristic behavioral manifestations known as seizures, whose form depends on the part of the brain where the electrical disturbance occurs or originates (the focus or focal point), and on the extent of the disturbance. Precise diagnosis of the condition can be difficult, since it requires both observation of the seizures and monitoring of the electrical disturbances through an electroencephalogram (EEG); indeed, epilepsy has been referred to as a "hidden disease," because it is virtually impossible to distinguish epileptics from nonepileptics, apart, of course, from their seizures and the electrical disturbances that accompany them.

Partial seizures, which are associated with electrical disturbances that have a focal point, may involve difficulty in speaking, visual or other sensory hallucinations, involuntary movements of various parts of the body, or convulsive movements; the partial seizure with complex symptomatology, or psychomotor seizure, involves complex combinations of these manifestations. Generalized seizures, which are associated with electrical disturbances of the entire brain, have two main forms. One form is the petit mal or absence seizure, in which the person suddenly enters a momentary trance-like state, sometimes described as a "staring spell," and may also perform automatic movements such as pacing or fum-

bling with clothing; another form is the grand mal or tonic-clonic seizure, which is characterized by violent convulsions, and is usually followed by a deep sleep. Partial seizures can often evolve into generalized seizures, as the electrical disturbance spreads within the brain; moreover, combinations of more than one type of seizure can be seen in a single person. Seizures themselves are often followed by periods of disorientation and confusion. The length and depth of confusion seems often to be directly related to the severity of the preceding seizure: the confusion that follows a severe grand mal seizure may last for several hours. Examples of the three main forms of epilepsy—grand mal, petit mal or absence, and psychomotor—are illustrated in the illuminating film, "Images of Epilepsy," with which plaintiffs began the presentation of their case.

Epilepsy may be associated with clearly evident brain injury—for example, brain tumors, diseases of the blood vessels, or traumatic injury—but it is just as likely that no such injury will be evident. In a very small number of cases epilepsy may be medically treatable by surgery, but the treatment of choice usually involves the administration of anticonvulsant drugs. In perhaps one-half of the cases of epilepsy, drugs can in essence completely eliminate seizures; in the remainder of cases the frequency and severity of the seizures can be lessened, but the seizures cannot be eliminated entirely. Even when medical control of seizures is entirely feasible, however, there may be several obstacles to its achievement: many partial or petit mal seizures are quite subtle and difficult to recognize, and a child may have such seizures for years before they are discerned and medical treatment is sought; the epilepsy may be misdiagnosed, or the physician's choice of drug or the dose prescribed may be less than optimal; and the epileptic's compliance with an appropriate medical regimen prescribed by his or her physician may, for any number of reasons, be less than perfect.

It is well established and accepted here that epileptic children are statistically at risk for having educational problems: educational deficits are more common in children that have epilepsy than in those who do not. The causal underpinnings of this statistical link, however, are neither simple nor entirely understood. The seizures themselves may have substantial effect on the child's ability to learn, particularly if they are frequent: plainly, the child will lose time from learning, both during the seizure and during the post-seizure period of confusion. This loss of learning time will, of course, be minimal in the child whose seizures are well controlled, but may be significant, for example, for the child whose seizures have not been diagnosed as epilepsy or in the child who does not comply with the prescribed medical regimen. Certain forms of epilepsy seem to be associated with particular forms of learning disability. For example, children with seizures whose focal points are in the left temporal lobe—an area of the brain especially involved in the acquisition of language—are at special risk for the development of language learning disabilities; in these children it may be that the epilepsy and the learning disability each reflect a common underlying neurological abnormality.

Common side effects of anticonvulsant drugs are another likely component in the link between epilepsy and school problems. In many cases, when the drugs are taken in doses sufficient to control the child's seizures, they also have a depressant or sedative effect that lessens the child's alertness and level of activity, and may even impair his or her coordination. In some other children, the drugs may have the paradoxical effect of increasing activity and distractability, as well as heightening irritability, to the point that violent emotional outbursts may result. These side effects can interfere with the child's learning in obvious ways, and in selecting the proper drugs and dosages the child's physician must steer an often difficult course between inadequate seizure control and excessive side effects.

Yet another likely component in the link between epilepsy and school problems is social and emotional difficulties that stem from the ignorance of those around the

child. The stigma that unfortunately is still associated with epilepsy, the notorious cruelty of children toward others who are "different," and the stubborn persistence of certain myths—for example, the myth that all epileptics are retarded, or the myth that epilepsy is contagious—may lead the child to shun his or her classmates, and even to develop a phobia of school. In the child whose epilepsy has not been recognized (or the child whose epilepsy has been hidden from the school), the deficits due to seizures or drug side effects can be magnified by inappropriate and negative teacher attitudes. The child who has absence seizures may be labeled as a "daydreamer;" a child with psychomotor seizures may be branded "unruly," "uncooperative" or "defiant;" a child dazed by his drugs may simply be regarded as a "slow learner." These teacher attitudes are not merely inappropriate: they can easily become self-fulfilling prophecies.

Indeed, the common thread that unites most of the likely links between epilepsy and school problems is ignorance. As Doctor Richard Masland, an eminently qualified neurologist who was executive director of the Commission for the Control of Epilepsy, testified most persuasively, an epileptic child's biggest problem is not the malady itself, but the ignorance regarding epilepsy that pervades the community, and that may infect not only the general public but the epileptic child, his or her family, the treating physicians, and other medical personnel, the child's teachers, the administrators at his or her schools, and other members of helping professions such as counselors, psychologists, and social workers. If the experiences of Tony Akers and Philip Moore are at all typical—and this Court is convinced that they are—it is plain that Wichita, Kansas does not escape Dr. Masland's generalizations.

But while statistically there is a definite link between epilepsy and learning disabilities, mental retardation, and social or emotional problems (and, for that matter, between epilepsy and other physical disorders such as cerebral palsy and certain allergies), and while it may be possible to identify a number of general causes that underly such links, the causal connection, if any, between an individual child's epilepsy and his or her school problems may be quite obscure. More important, even when it may be plausible to hypothesize that a given child's school problems are in some particular way "caused" by his or her epilepsy, that child's problem will often be indistinguishable in any meaningful sense from similar problems found (albeit less frequently) in children who do not suffer from seizure disorders. As a practical matter, it may make very little difference that a child has a social problem, and hates school, because he has been ridiculed by his classmates because of his seizures rather than because of his unusual name, unstylish wardrobe, or lack of athletic prowess; similarly, a child who loses time from learning because of undiagnosed petit mal seizures may not have any greater scholastic deficit, once his seizures are diagnosed and under good medical control, than a child who has lost equivalent time from learning because he has been daydreaming. In other words, the answer to the question, "who or what is to blame for this epileptic child's school problems," may have little bearing on the answer to the question, "what should now be done about those problems."

In the interest of clarity and in relation to the Court's view as to the formulation of a class, and the propriety of injunctive relief, some tracing of the plaintiffs' circumstances is in order.

Plaintiff Anthony Akers is now 19 years old. He has been diagnosed as having partial complex epileptic seizures, with focus in the right temporal/occipital area of his brain; these seizures are sometimes described alternatively as psychomotor seizures, and can generalize into grand mal seizures. These seizures are now well controlled through use of the drug Tegretol.

Tony's mother observed him having his first definite epileptic seizure—a grand mal attack—when he was 10 years old, although she now suspects that he may have been having absence or psychomotor seizures sev-

eral years earlier. Although Tony was taken to his family pediatrician and placed on anticonvulsive medication, and despite reports from school of seizure-like behavior (including reports made by a concerned school nurse directly to the pediatrician), no explicit diagnosis of epilepsy was made at that time, or indeed for nearly six years. School health records from 1973 to 1976, however, are replete with references to seizures—including grand mal seizures reported by Tony's mother—and to Tony's being on or off various forms of anticonvulsive medication.

Tony's academic performance began to deteriorate during seventh grade, as did his social adjustment; the frequency and severity of his seizures increased as well, apparently in part because he was not consistently taking the anticonvulsive medication (it was not revealed whether this was due to doctor's instructions or a failure on Tony's or his mother's part); it has been said that during this period Tony developed a phobia or hatred of school and was frequently truant. Tony's attendance at and attitude toward school apparently improved somewhat after the middle of eighth grade, when he transferred to a smaller "alternative" junior high school with a "less authoritarian" atmosphere; this improvement may also have reflected an arrangement whereby Tony was administered his anticonvulsive medication in the principal's office. This arrangement was not continued in ninth grade—apparently Tony's mother believed it would be appropriate for Tony to take responsibility for his own medication. Toward the end of ninth grade Tony's adherence to his medication regimen lessened and his emotional state took a turn for the worse. He was briefly hospitalized following a suicide attempt and his pediatrician referred him to a colleague for psychiatric therapy. At this time, Tony presented the picture of a confused, withdrawn, rebellious adolescent almost totally without self-confidence and plagued by seizures that were not under medical control. He was able, however, to meet the academic standards of the school and he received full academic credit through ninth grade.

Following Tony's graduation from junior high school, he was assigned to Wichita East High School—the comprehensive high school in whose attendance area he lived—for the fall of 1977. Mrs. Akers was apprehensive as to Tony's ability to cope with a very large, impersonal high school, whose atmosphere differed greatly from the alternative junior high school, and apparently also had doubts as to Tony's ability to cope academically at East. In any case, she approached a counselor at the school, described her concerns, related Tony's history, and asked what could be done. As Mrs. Akers now relates it, had she been familiar with special education jargon, she would have requested a comprehensive evaluation of Tony; in any case, she was asked by the counselor to sign a parental consent for such an evaluation and she did so. Certain psychological tests were administered to Tony by the school psychologist; Mrs. Akers also made arrangements to have some testing by a clinical psychologist in private practice. It seems the school psychologist hypothesized that Tony might have a learning disability related to his epilepsy. The private psychologist to whom Tony was referred, however, preferred the hypothesis that Tony was well on the road to serious psychopathology. Mrs. Akers did not choose to share this rather negative report with the school system.

In the meantime, however, Tony was proving the prescience of his mother's fears: he had several unpleasant run-ins with teachers at the school, found himself instantly unpopular with his fellow students, and was plagued with seizures of increasing severity and frequency, until he was experiencing several grand mal seizures a week. The last straw was reportedly an incident in late October, in which Tony was cornered in the hall by a pack of youths who taunted him and challenged him to fight: this incident culminated in a grand mal seizure. Tony thereafter flatly refused to return to school.

It was then decided to hospitalize Tony in the hope of achieving medical control of his epilepsy. As a result of Mrs. Akers' prod-

ding, Tony's psychiatrist and his pediatrician each filed a written "Application for Approval of Homebound or Hospital Instruction," and Tony was thereby officially withdrawn from school and arrangements for a homebound instructor were made. The pediatrician appears to have been reluctant to make a recommendation for homebound instruction; he appended to the printed application form the handwritten comment that "[Tony] can attend school from a medical standpoint. He refuses to do so. We cannot get him to comply with his medical regimen to control his seizure disorders." In any case, the homebound instruction was scarcely productive: Tony did not cooperate with the instructor—on several occasions deliberately skipping their appointments—and completed virtually none of the assignments he was given. Just before Christmas Mrs. Akers and the homebound instructor mutually agreed to abandon the homebound program, and Tony received no formal schooling for the remainder of the academic year. It seems that the school authorities, exasperated by what they regarded as Tony's uncooperative attitude, simply washed their hands of the boy.

In the spring of 1978, Mrs. Akers took Tony to a different physician, a neurologist, who made the first explicit diagnosis of epilepsy made known to Tony or Mrs. Akers. This physician, Dr. Gilmartin, made written inquiry of the school district as to what had led to Tony's removal from school and what might be done to re-enroll him. In further correspondence, Dr. Gilmartin explained:

> He is a rather difficult partial seizure with complex symptomatology. We presently have him under fairly good control. We are attempting to initiate a program of rehabilitation for Anthony. Part of the difficulty in coping with Anthony in the past was lack of understanding about the seizure disorder. This was a failing of his parents as well as many professional people who have been involved in his care. The fact is that Anthony has a partial seizure with complex symptomatology and he has been out of seizure control for years. We think we are getting him under control and thereby eliminating the one great social stigma that evolves around his fear of having seizures in public. I think he should be re-introduced into the school, and I must say I do not know the ideal way in which to accomplish this. He needs to have fairly enriched educational experience as well as a humanistic plan of management for the patient and his family. I would appreciate receiving a copy of his IEP and will be more than happy to communicate with you concerning specific questions.

The school system, however, remained wary. The district's director of special education wrote to Dr. Gilmartin:

> We have not done any individual diagnosis of Anthony because of his non-complaint behavior, and we have made recommendations which apparently are being followed through for Anthony to receive medical help. Hopefully, with the change in the medical regimen and an appropriate diagnosis, we may be able to work with Anthony more successfully. I am requesting, therefore, that you advise us as to the probability of Anthony being successful, possibly on a limited homebound program where we can assess his behavior problems in relation to the environments we have available presently in our school system. We would also like an opinion as to whether an individual assessment at this point in time would provide results upon which we could plan an educational program for Anthony. Hopefully by working together, we will be able to get this student back into our school system.

Dr. Gilmartin must have been able to assuage the school system's concerns, because Tony was permitted to enroll in Metro High School in the fall of 1978.

Metro High School is a unique "alternative" high school operated by the defendant school district. It is designed to serve students who have not remained in the district's comprehensive high schools for a variety of reasons, including academic difficulties, attendance problems, health prob-

lems, conflicts with employment schedules, etc. The school emphasizes individualized instruction under which students work at their own pace, and is relatively low key with regard to attendance requirements and the rate at which credits are earned: credit is given when the corresponding work is completed, irrespective of how long it takes the student to complete the necessary work. In comparison to the comprehensive high school, Metro has extremely low ratios of students to teachers and, even more strikingly, of students to counselors.

Within the first few weeks of his attendance at Metro, Tony developed a pattern of attending only his first two classes, psychology and industrial education. Tony's schedule was then changed so that he was to attend industrial education his first two hours and psychology his third and fourth hours. It was recognized that such a program would delay the time when Tony could fulfill graduation requirements, but it was hoped that Tony's motivation toward school attendance might be heightened. By Christmas this approach had shown mixed results as far as attendance was concerned: Tony was nearly always present during the first two hours of school, sometimes present during third hour, and almost never present during fourth hour. Although Dr. Gilmartin's prescribed regimen had greatly improved the medical control of Tony's seizures, total control was not achieved: Tony had at least one grand mal seizure while at school. Tony seemed to be making considerable progress emotionally and socially, and seemed much less withdrawn and depressed. Academically, however, Tony was achieving very little, since he put forth his only real effort in his industrial education class. Indeed, it is transparent that the paramount obstacle to Tony's educational progress was the almost total absence of any interest or motivation toward making progress in school.

Mrs. Akers was very impressed by the "supportive and concerned" attitude of the Metro staff, and by Tony's response to this attitude, but was concerned over the fact that Tony had fallen behind academically. Mrs. Akers consulted a psychologist in pri-

vate practice, Ted Fremont, who administered educational tests, conducted a "psychological assessment," and made several recommendations. Dr. Fremont's IQ tests showed that Tony was of average intelligence, and his achievement test showed that Tony was generally slightly below grade level, with a particular deficit in spelling, where Tony performed at a high fourth grade level. Dr. Fremont told Mrs. Akers that there were two reasons for Tony's underachievement:

> First, he appears highly unmotivated and uninterested in the academic material. Second, because of the long-term nature of his epilepsy, he has experienced difficulty learning, and, as a result, did not have sufficient exposure to basic academic material. Considering the fact that he did not attend school for the last academic year, we would expect his achievement scores to be depressed.

Dr. Fremont also observed that Tony "does not see the value of a high school diploma; and if he is sufficiently pressured to attend school, there is some likelihood that he may drop out." Dr. Fremont made several specific recommendations: (1) that Tony be given highly directed, structured, individualized attention in those subjects he was deficient in; (2) that the school personnel be educated so that they could recognize Tony's seizures when they occurred and understand the effect of those seizures; (3) that giving Tony an opportunity to study those things he was interested in be used as a reward for studying those things he was not interested in; (4) that Tony be given specialized tutoring outside of school. Mrs. Akers immediately implemented Dr. Fremont's last recommendation: she hired a tutor to work with Tony on his spelling and handwriting.

After Dr. Gilmartin told Mrs. Akers, as Tony's previous physicians had not, that Tony was an epileptic, that his epilepsy had been relatively uncontrolled for years, and that the malady was in all probability the source of many of Tony's school problems, Mrs. Akers immersed herself in what might be described as an intensive program of self

education that covered virtually all aspects of epilepsy, including medical, educational and legal ramifications. As Mrs. Akers accumulated literature on epilepsy, she made copies of some of it, and she gave those copies to the school district's new Director of Special Education, Dr. James Dyk, and to other school personnel. Mrs. Akers has continued her study, and any lack of formal educational credentials has been more than counterbalanced by her obvious maternal concern and her energy. It is unlikely that more than a handful of people in Wichita can match Mrs. Akers in breadth of knowledge regarding epilepsy, whatever their profession.

By late 1978, Mrs. Akers had become aware of the Diagnostic Treatment and Rehabilitation Program at the Comprehensive Epilepsy Program at the University of Minnesota. This program utilizes a comprehensive or "team" approach to treating people who have had chronic problems with seizure control, and takes advantage of physicians, nurses, psychologists, educational specialists, counselors, and vocational therapists, all of whom have particular skills and expertise relevant to the special problems faced by epileptic patients. The program agreed to accept Tony as a patient, and he was scheduled to be admitted there in late January 1979.

In the meantime, Mrs. Akers became convinced that Tony was a "handicapped" child who needed and deserved special education services. In December 1978, she demanded that the school district conduct a comprehensive evaluation of Tony and provide him with an individual education plan and special education services that would in large part track Dr. Fremont's recommendations. The district's evaluation of Tony included the results of the testing performed the previous year by the school psychologist, a lengthy social history obtained from Tony and Mrs. Akers by a school social worker, a health report by the Metro school nurse that described Tony's medical condition and prescribed drug regimen, a brief report from a Metro counselor, and reports from each of Tony's teachers at Metro and from Jane Ware, the principal of the school. A

"staffing" meeting was convened on December 21, and was attended by those Metro personnel who had prepared reports on Tony, by the school psychologist who had tested him, by Dr. Dyk, and by Mrs. Akers, who was accompanied by Joan Strickler, the Executive Director of Kansas Advocacy and Protective Services for the Developmentally Disabled. The various reports on Tony—including Dr. Fremont's report—were discussed, and possible options for Tony outlined, but no formal decision was reached; all parties agreed, rather, to "adjourn" the staffing to a later time pending Tony's treatment in the Minnesota program and the receipt of reports from that institution. It was hoped that Tony might achieve seizure control while in Minnesota, and that the Minnesota reports might contain information relevant to determining the proper educational response to Tony's situation.

Tony entered the Minnesota program in late January 1979, and remained there until early March; while at Minnesota Tony was subjected to an elaborate program of medical testing, his prescribed medications were changed, and he achieved virtually perfect seizure control for the first time. The adjourned staffing was reconvened in May 1979, upon receipt of the written Minnesota reports. At this second meeting, which was attended by most of those present at the first meeting and by Dr. Fremont as well, it was decided by the school district, notwithstanding Mrs. Akers' objections, that Tony should remain at Metro and that the "special education services" that Mrs. Akers sought were not appropriate. The basis for this decision is not totally clear from the record, but one major consideration seems to have been the fear that if a highly structured program, supplemented by outside tutoring, was imposed on Tony, he might rebel completely and refuse to attend school at all; a second important consideration was the highly individualized instruction and counseling available at Metro: while Metro is not categorized as a "special education" facility, it is nonetheless a unique and "special" institution that is in many ways suited to children such as Tony Akers. The school

district has not changed its position with regard to Tony's educational placement, although Mrs. Akers has several times renewed her demands, and additional staffings have transpired.

Tony's performance at Metro upon his return from Minnesota reflected a vast improvement in his emotional and social adjustment, but his academic performance was chequered: as previously, the major obstacle to Tony's academic achievement, creditwise, has been his lack of motivation with regard to school performance. In his entire time at Metro, Tony has received less than one year's worth of academic credit. In late 1980, Tony in essence ceased his attendance at Metro, although he has continued to visit with the staff members there, in particular with Mrs. Ware. In 1980, he was briefly involved in a CETA training program, and has apparently held several jobs; in about the summer of 1981, he began attending courses at the Wichita Auto Institute, a private vocational training facility, and seems to have done rather well there. Tony now lives on his own, apart from his mother, although she apparently continues to provide the bulk of his financial support. In fairness, he now appears to have a reasonable grasp of his options and limitations, and to possess a mature attitude as to his future.

Plaintiff Philip Moore is now 16 years old. He has been diagnosed as having partial complex epileptic seizures, with apparent focus in the left temporal area of his brain; as in the case of Tony Akers, these psychomotor seizures can generalize into grand mal seizures. In the spring of 1981, after the present lawsuit was brought, surgery was performed on Philip at the University of Minnesota Epilepsy Center, and a benign tumor—or "calcified lesion"—was removed from his brain. It is thought that this tumor played a causative role in Philip's epilepsy and it is hoped that the tumor's removal will alleviate his seizures. Since the surgery, Philip has had no seizures, although he continues to take anticonvulsive medication.

Philip had his first known seizure in the summer of 1978. His parents immediately sought medical assistance, and he was placed on anticonvulsant medication; he had no more seizures until early in 1979. Prior to the onset of his epilepsy, Philip had been an average student, was relatively well adjusted socially, and had a good attitude toward school. In the spring of 1979, however, when Philip was completing eighth grade, his school performance began to decline and his attitude toward school deteriorated. At that time, Philip's grand mal seizures were medically controlled, but Philip was having psychomotor seizures quite frequently in school; some of those seizures were observed by Philip's teachers, one of whom reported them to Philip's parents. Philip was hospitalized for a few weeks in the spring of 1979, and he was placed on heavier dosages of anticonvulsant drugs. During the remainder of the school year and the following summer, Philip had a number of violent altercations, both at school and at home, which might be described as "rage reactions" on Philip's part; in the summer and early fall he twice was briefly hospitalized, and his medication regimen was again changed. In the early fall of 1979, Philip had another rage reaction during a soccer game, when a foul was called on him, and he had to be physically restrained; shortly thereafter a particularly violent rage reaction occurred which resulted in police being called and using tear gas to remove him from the family home. The police took him to the psychiatric unit of a local hospital, where Philip's rage reactions were ascribed by his physician in part to the influence of his anticonvulsant drugs. Philip was placed on homebound instruction in November 1979. He returned to school in January 1980, and his mother apparently had communication with each of his teachers to explain his epilepsy, his prescribed program of medication, etc. Unfortunately, Philip was having several psychomotor seizures daily, was ridiculed by some of his classmates, and dropped one class in which such ridicule had evidently been particularly acute. In April he was again placed on homebound instruction and he did not re-

turn to school for the remainder of the school year. Philip's academic performance while at school and on homebound instruction was sufficient for him to complete ninth grade and he graduated from junior high school.

In the summer of 1980, Philip was taken by his parents to the University of Minnesota Epilepsy Center where, as had Tony Akers, he received a very comprehensive program of medical testing, diagnosis, and treatment, psychological and educational testing, counseling, and psychotherapy; this program took up the better part of his summer. The psychological testing revealed that Philip was quite normal and that his IQ and cortical functions were generally in the high average range, although minor deficits were noted in vigilance and attention tests and in verbal fluency. Philip was fully sociable and cooperative while in Minnesota, and was described as a model patient. The Minnesota doctors were not able to achieve full seizure control, however.

When Philip entered Northwest High School in the fall of 1980, he was still having frequent psychomotor seizures, and the side effects of the very heavy regimen of drugs prescribed by the Minnesota doctors were substantial; Philip suffered from double vision, dizziness, frequent nausea, and had pronounced difficulty in concentrating. Philip's parents had contacted the school principal and the district director of special education, James Dyk, and Dr. Dyk was provided with the reports from Minnesota. The Moores did not request a comprehensive evaluation or special education services from the school district, and none was offered. The school nurse and all of Philip's teachers were aware of his epilepsy and drug regimen, and Philip was being closely monitored at school; the school nurse made regular reports on Philip to his parents. The Moores had in the meantime, however, been in contact with Mrs. Akers, and became convinced that Philip was not receiving his due from the school district; they accordingly joined this lawsuit as plaintiffs.

Shortly thereafter, in September 1980, the Moores gave written consent to a comprehensive evaluation of Philip. Extensive testing was done by the school psychologist; the results of IQ and achievement testing of Philip were similar to those obtained in Minnesota, with Philip's performance generally being somewhat above average, although Philip did quite poorly on one achievement test, making what were described as "many careless errors." The comprehensive evaluation included reports from the school psychologist, a lengthy social history taken by a school social worker, and reports from all of Philip's teachers. At an October staffing meeting it was decided to maintain Philip's placement in regular education but to continue to monitor his classroom progress, medication, and seizure activity. Philip continued to have daily seizures, however, and his school performance was quite poor, particularly in automobile information and in algebra, classes in which he was receiving failing grades. The school concluded that the plan arrived at in the previous October staffing "was not working." A second staffing was held in December and it was concluded that it would be appropriate to place Philip in a special education program for "other health impaired;" a lengthy, written "individual educational program" was accordingly prepared. Under this program, Philip remained in his regular classroom and, apart from the explicit written plan, the major change in his educational treatment was the heightening of the monitoring of his educational progress, and the institution of daily half hour sessions with the school counselor. The Moores are satisfied with this result and seek no more from the school district.

At about Thanksgiving, Philip was again seen by doctors at the University of Minnesota, and the possibility of surgery was raised since Philip's seizures had not been brought under medical control. Philip was hospitalized at the University of Minnesota in February; after additional medical testing it was decided to go ahead with surgery. As mentioned above, this treatment seems to have eliminated Philip's seizures, at least for the time being. Philip returned to

Northwest High School in mid-April, and continued his attendance there for the remainder of the year. The combination of his poor performance before the surgery and his lengthy hospitalization was such that Philip could not receive full academic credit for tenth grade. At the present, Philip's major educational problem is that he has fallen behind his age mates in terms of school credit, although his performance had remained shaky in some academic areas. It has been suggested that Philip may simply graduate behind his age mates, although the possibility has also been raised that he might graduate on time if he attended summer school or if the graduation credit requirements were relaxed in his individual case.

Can there be any question why, at the close of plaintiffs' case, the Court expressed the opinion that the experiences of these two young men typified the effects of the pervasive community ignorance to which Dr. Masland testified? These appalling histories are deserving of full public exposure; indeed, the Court can only hope that this trial—perhaps even by circulation of its transcript—might be of at least some small benefit in reducing the ignorance that yet exists.

 Now that the full case is before the Court, a decision on plaintiffs' motion for class certification is in order. The class that plaintiffs propose to represent consists of all school age epileptic children in Kansas, and the parents of those children. It is well established that before a suit may proceed as a class action, all four of the prerequisites set out in Rule 23(a) of the Federal Rules of Civil Procedure must be satisfied, as must at least one of the subdivisions of Rule 23(b). *Peterson v. Oklahoma City Housing Authority*, 545 F.2d 1270 (10th Cir. 1976). Rule 23(a) provides that:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of

law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

The Court does not understand defendants to contend that plaintiffs do not meet the numerosity requirement of Rule 23(a), and notwithstanding certain technical arguments raised by defendants, the Court believes that it is plain that plaintiffs have met the rule's requirements as to adequacy of representation. The typicality and commonality requirements are somewhat more problematic, at least inasmuch as the defendants contend—and the Court agrees—that not all epileptic children require special education, that those who do require special education require a wide range of individualized educational responses, that identification of epileptic children who do not need special education might result in the unnecessary stigmatization of those children, and that this problem would be compounded by the inevitable misdiagnosis of some children. The Court does not believe it inappropriate to regard plaintiffs as having met the requirements of Rule 23(a), since it is mindful of the admonition that "if there is to be error made, let it be in favor of and not against the maintenance of the class action." *Esplin v. Hirschi*, 402 F.2d 94, 99 (10th Cir. 1968), *cert. denied* 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969); *see also Wilcox v. Commerce Bank*, 474 F.2d 336, 344 (10th Cir. 1973). It seems, however, that satisfaction of the requirements of Rule 23(a) is not the essential problem with plaintiffs' class claims; indeed, anticipation of the effects of Rule 23(b) has been, from the outset of this case, a basis for this Court's insistence, over the objections of defendants, that the trial of this case not be bifurcated.

In order to satisfy the requirements of subdivision (b)(2) of Rule 23[1] plaintiffs must establish that defendants have:

---

1. Plaintiffs do not seek to bring this case under (b)(1) or (b)(3); the former is plainly inapplica-

ble, while under the latter the Rule 23(c)(2) requirements of notice to each individual (b)(3)

... acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; ...

As explained below, plaintiffs have failed to persuade the Court that this requisite has been satisfied.

The gist of plaintiffs' class claim is that defendants have a policy of not recognizing epilepsy per se as a handicapping condition, and that, presumably as corollaries to this policy, defendants make little or no effort to identify those children who are epileptic, and do not automatically initiate the evaluation of those children who have been identified as epileptic to determine whether they might need or benefit from a program of special education and related services. Defendants do not dispute that these are their policies, and there is thus no question that defendants have, by these policies, "acted or refused to act on grounds generally applicable to the class" of epileptic children. The question is whether these policies violate the constitutional or statutory rights of this class, as plaintiffs contend to be the case; only then would declaratory or injunctive relief be appropriate with respect to the class as a whole. The Court concludes that defendants' above-described policies plainly do not violate any of the constitutional or statutory provisions cited by plaintiffs, which provisions, in concert with the evidence, will now be discussed.

### A. The Education of All Handicapped Children Act

 The Education of All Handicapped Children Act (EAHCA), 20 U.S.C. § 1401 et seq., represents a "federal statutory description of a handicapped child's right to an education," and aims to insure that states will have sufficient funding to assure the provision of a "free appropriate public education" to all handicapped children between the ages of 3 and 21. Note, *Enforcing the Right to an "Appropriate" Education: the Education for All Handicapped Children Act of 1975*, 92 Harv.L.Rev. 1103, 1105 (1979). The Act also grants to the handicapped child and his parents elaborate procedural rights to contest and receive review of the acts of educational authorities, see 20 U.S.C. § 1415, and explicitly delineates the group of children on whom it bestows these rights: those "mentally retarded, hard of hearing, deaf, speech impaired, visually handicapped, seriously emotionally disturbed, orthopedically impaired, or other health impaired children, or children with specific learning disabilities, who by reason thereof require special education and related services. The implementing federal regulations state that "other health impaired" means, in relevant part, "limited strength, vitality or alertness due to ... health problems such as ... epilepsy ... which adversely affects a child's educational performance." 45 C.F.R. § 121a.5(b)(7). Since it is undisputed that not all epileptic children are in need of special education[2] or related services,[3] the plain language of the statutory definition compels the conclusion that the special rights under the statute do not run to all epileptic children as a class. Of course, such syllogistic reasoning would make little sense if, for practical purposes, the class of epileptic children was coextensive with the class of handicapped epileptic children, just as it would make little practi-

---

class member would no doubt be impossibly burdensome to plaintiffs.

**2.** Defined in the Act as "specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a handicapped child, including classroom instruction, instruction in physical education, home instruction, and instruction in hospitals and institutions." 20 U.S.C. § 1401(16).

**3.** Defined in the Act as "transportation, and such developmental, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, and medical and counseling services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist the handicapped child to benefit from special education, and includes the early identification and assessment of handicapping conditions in children." 20 U.S.C. § 1401(17).

cal sense not to evaluate a blind child for special education until he had clearly shown that he was having difficulty in ordinary classroom, simply because one blind child in a thousand might be able to function well without special education. In this case, however, the classes of epileptic children and of handicapped epileptic children are not coextensive: in all probability only a minority of epileptic children are handicapped in the sense of needing special education. Moreover, it was not shown that the policies of which plaintiffs complain have caused any wholesale denial of the statutory rights of handicapped epileptics as a matter of practical effect. Within U.S.D. 259, for example, out of 45,000 school children, the district itself has identified 334 children, or .74% as epileptic. Plaintiffs' expert witness, Dr. Richard Masland, estimated the proportion of school age children with epilepsy to be 1%: it is entirely plausible that many of the "missing" .26% are the children of parents who, wary of the stigma that can attach to epilepsy, prefer to conceal their children's epilepsy from the school authorities.[4] Moreover, of the 334 identified epileptic children in the district, 131, or 39.4% are receiving special education services; this figure is not at all out of line with the estimates of the proportion of epileptic children that would be expected to have school problems. In view of the incredibly broad variety of needs presented by handicapped children (or indeed by handicapped epileptic children), and the inevitable disagreements over what the best educational approach to a given child (or indeed to children in general) might be, it is to be expected that parents and schools will not always see eye to eye, or that, in the abstract, school officials may make "wrong" decisions: that is why Congress provided the parents with a procedural avenue to challenge those decisions. *See* 121 Cong.Rec. 37412 (1975); *id.* at 25531; *see generally* Kirp, Buss & Kuriloff, *Legal Reform of Special Education: Empirical Studies and Procedural Proposals*, 62 Cal.L.

Rev. 40 (1974). The Court deems it significant, however, that in the Court's view not a single one of the individual children with regard to whom evidence was presented—including the named plaintiffs—suffered from school personnel who acted unreasonably or in bad faith.

B. *Kansas Special Education for Exceptional Children Act*

The Kansas Special Education for Exceptional Children Act, K.S.A. 72–961 *et seq.*, and the State Special Education Plan and other regulatory implementation of this Act, closely parallel the EAHCA. Rights under these laws run to "exceptional children," defined as persons who are of school age and who "differ in physical, mental, social, emotional, or educational characteristics to the extent that special education services are necessary to enable them to progress toward the maximum of their abilities or capacities," K.S.A. 72–963(f): the chief difference between this state law term and the EAHCA term "handicapped children" is that the former includes "gifted children," K.S.A. 72–963(g), while the latter does not. Inasmuch as the analysis under the Kansas special education laws is virtually identical to that under the EAHCA, the Court will not repeat that analysis. Suffice it to say that no class-wide violation of the Kansas Special Education for Exceptional Children Act has been shown.

C. *The Rehabilitation Act of 1973*

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, provides that "no otherwise qualified handicapped individual . . . shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance": the Rehabilitation Act in turn defines "handicapped individual" as "any person who (i) has a physical or mental impairment which substantially limits one or more of such

---

**4.** Of course, we have no way of knowing how many children are epileptic and receiving special education services, but are not coded as epileptic on the district's computer, since the district's explicit identification of epileptic children is apparently somewhat haphazard.

person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." This definition is considerably broader than that under the EAHCA, and doubtless encompasses the class of epileptic school children. *See Drennon v. Philadelphia General Hospital*, 428 F.Supp. 809 (E.D.Pa.1977); *Duran v. Tampa*, 430 F.Supp. 75 (M.D.Fla.1977).[5] The policies that plaintiffs complain of cannot be deemed in violation of § 504, however, because they do not, on a class-wide basis, deny special education services to "qualified" epileptic children—that is, to epileptic children who need special education services.[6] It is self-evident that a policy of limiting special education services to those deemed by defendants to require them is reasonable. *Cf. Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979) (nursing school does not violate § 504 by imposing reasonable physical requirements on students: affirmative action not required).

### D. *The Equal Protection and Due Process Claims*

■ Insofar as the Court is able to decipher plaintiffs' equal protection claims, which have not been emphasized by their counsel, the Court understands plaintiffs to contend that defendants' policies of not recognizing epilepsy as a categorical handicap have the effect of denying to the plaintiff class members the opportunity to receive the special education services they need. The Court does not believe plaintiffs have established that defendants' policies have such a discriminatory effect on the class, but even if they had, they would not thereby establish a violation of the equal protection clause. Even when other plaintiffs have established that the policies of which they complain had pronounced discriminatory effects on classes that have traditionally received the highest degree of judicial solicitude, such as racial minorities and women, they have been required to establish that such discriminatory effects were accompanied by racially or sexually discriminatory intent if they were to make out equal protection violation. *See, e.g., Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Personnel Adm. of Massachusetts v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). It would be an incredible anomaly if blacks and women had to establish that discriminatory effects reflected discriminatory purpose to prevail on an equal protection claim but epileptics did not. Of course, in the present case there is not a scintilla of evidence to suggest that any of the defendants, or the legislators or federal regulators whose will they have attempted to implement, have acted out of some insidious, malevolent desire to deny epileptics access to special education.

Any class-based due process claim is also meritless. To begin with, plaintiffs have not established any liberty or property rights of the class of epileptics that are being denied. More important, defendants have made available the elaborate administrative remedies required by the EAHCA. *Cf. Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) (no due process claim stated for negligent loss of prison inmate's property where state tort claims remedy available).

---

**5.** It should be noted that all persons who are handicapped under the Rehabilitation Act are handicapped under the EAHCA, that all persons who are not handicapped under the Rehabilitation Act are not handicapped under the EAHCA, but that some persons who are handicapped under the Rehabilitation Act are not handicapped under the EAHCA.

**6.** See 34 C.F.R. § 104.3(k)(2)(iii). Subsection (k)(2)(i) does not apply because special education services are not provided to nonhandicapped children; while subsection (k)(2)(ii) does not apply because it is not mandatory under Kansas law to provide special education services to children handicapped in the rehabilitation act sense of the term, but only to those handicapped in the EAHCA sense of the term. Many of plaintiffs' arguments from the regulations in 34 C.F.R. Part 104 reflect a failure to appreciate the distinction between the two different definitions of "handicapped" under the two acts. See Footnote 5, *supra*.

E. *Individual Claims and Other Findings*

█ While the foregoing findings clearly suffice as a basis for this Court's ultimate conclusions, some comment is necessary with regard to other issues raised in this case. A most critical issue is the plaintiffs' respective failures to exhaust certain administrative remedies. This Court now acknowledges having ignored defendants' arguments on this point at the time of their respective motions for dismissal upon completion of the plaintiffs' case; the same, however, were taken under advisement at that time.

Congress has made the right to bring an action in state or federal court under the Handicapped Act *explicitly contingent* on the exhaustion of administrative remedies that involve not one, but two levels of appeal. 20 U.S.C. § 1415(e)(2). This administrative process of "due process hearings" is subject to statutory and administrative requirements designed to insure that the case will be heard on an adequate record by an examiner who is independent of the school authorities and has knowledge of available alternatives. With one exception, the available administrative review has not begun, much less been exhausted. This exhaustion requirement on its face applies only to the Handicapped Act, but it cannot have been the intent of Congress to allow circumvention of the carefully delineated exhaustion requirement by bringing the action under the general antidiscrimination provision of the Rehabilitation Act under regulations implementing both Acts, set forth in 34 C.F.R. Part 104(D). While the Courts have recognized that the exhaustion requirement is excused if the exhaustion would be futile, *see, e.g., Monahan v. Nebraska*, 491 F.Supp. 1074 (D.Neb.1980), in the case at bar, this was not established.[7] In view of the explicit exhaustion requirement under the EAHCA, 20 U.S.C. § 1415(e)(2), and since it has not been shown that recourse to the administrative procedure provided by 20 U.S.C. § 1415(b)(2) and (c) would be futile, the claims of plaintiff Tony Akers that are based on the EAHCA must be dismissed.

█ The Court also concludes that plaintiff Tony Akers ought not be allowed to circumvent the scheme of administrative remedies so carefully constructed by Congress, by using the EAHCA as a path into 42 U.S.C. § 1983. Plaintiffs' analogy to *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), is not well taken; the EAHCA is a clear example of a remedy created by Congress for improper special education action that was intended to be exclusive. *Anderson v. Thompson*, 658 F.2d 1205 (7th Cir. 1981).

█ Plaintiff Tony Akers' claims under the Kansas special education laws must also be dismissed for failure to exhaust available, adequate administrative remedies. *See* K.S.A. 72–972 to 974.

█ Plaintiff Tony Akers' claims under the Rehabilitation Act must be dismissed because he did not establish that defendants failed to provide him the special education services he desired because of his epilepsy, much less "solely" because of his epilepsy. The very gravamen of his EAHCA claim is that defendants did not deem his epilepsy as an automatic entree into special education; we have already seen that the Rehabilitation Act does not require affirmative action. *See Southeastern Community College v. Davis, supra.*

Assuming that Tony is raising an individual equal protection claim, that claim must be dismissed for essentially the same reason that the corresponding class claim was dismissed: Tony has utterly failed to establish that those actions taken by defendants in his case had anything to do with an invidious, malevolent desire to deny him access to special education, whether because of his epilepsy or otherwise. Any individual due

---

**7.** Indeed, in the only instance made known to the court where the parent of an epileptic child disputed the school district's action and sought a due process hearing under § 1415(b)(2)—the Denny McKay case, as related by his mother, Karen McKay, a rebuttal witness for plaintiffs—the school district's placement was overturned and the parents preferred resolution adopted by the hearing examiner.

process claim must also be dismissed; as defendants put it, any claim of a denial of due process rings false in one who has deliberately refused to avail himself of administrative remedies that might well have gained him that which he seeks in the present case.

■ Madeline Akers' individual claims under the EAHCA for reimbursement of various expenses she has incurred must, with one exception, be denied because of her failure to exhaust (or indeed, to pursue at all) the administrative remedies provided in the Act. The exception is her claim to reimbursement for the cost of the so-called "comprehensive evaluation" that Tony was given at the University of Minnesota's Comprehensive Epilepsy Program; because of events that have occurred since this lawsuit was commenced, it is plain that the exhaustion requirement does not apply to this particular claim. In her complaint, Mrs. Akers pointed out that under 45 C.F.R. § 121a.503(b), a parent has a right to "an independent educational evaluation at public expense" if the parent disagrees with a school district's evaluation of his or her child, unless the school district initiates a due process hearing and obtains a determination that its evaluation of the child is "appropriate," in which case the parent "still has the right to an independent educational evaluation, but not at public expense." U.S.D. 259 accordingly requested a due process hearing on the issue of the appropriateness of its evaluation of Tony. Mrs. Akers, on advice of counsel, declined to participate, and the hearing examiner determined that the district's evaluation was "appropriate." This determination was affirmed on appeal to the State Board of Education. Since defendants' policies are that reimbursement for independent evaluation is not required when the local school district's evaluation has been determined to be "appropriate," it would plainly be futile for Mrs. Akers further to pursue her request for reimbursement through administrative channels. The Court concludes, however, that Mrs. Akers is not entitled to reimbursement for these expenses.

■ The EAHCA provides that the court hearing the case "shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). Those district courts that have considered the issue have not agreed as to whether money damages are available under the Act. *Compare, e.g., Tatro v. Texas,* 516 F.Supp. 968 (N.E.Tex. 1981), *and Boxall v. Sequoia Unified School District,* 464 F.Supp. 1104 (N.D.Cal.1979), *with Miener v. Missouri,* 498 F.Supp. 944 (E.D.Mo.1980) *and Loughran v. Flanders,* 470 F.Supp. 110 (D.Conn.1979). In the only case where one of the courts of appeals has dealt with the issue, *Anderson v. Thompson, supra,* the Court of Appeals for the Seventh Circuit, in a thoughtful, scholarly opinion penned by Judge Swygert, determined that tort liability damages would never be appropriate, *id.* at 1213 n. 12, and that retroactive reimbursement for the parents' cost of obtaining services that the school district should have provided would be appropriate only in exceptional circumstances, such as where the school district failed to provide for required services and the child's physical health would have been endangered had the parent not made alternative arrangements, or where the school board had acted in bad faith, *id.,* at 1213–1214. Inasmuch as this Court regards Judge Swygert's analysis as sound, and inasmuch as Mrs. Akers has not come close to showing that her situation is one where exceptional circumstances of the sort mentioned by Judge Swygert might make a damage award appropriate, it follows that plaintiff Madeline Akers' claims for reimbursement of the Minnesota expenses must be dismissed.

At the outset, it is apparent that the individual claims of plaintiffs Arlene, Donald and Philip Moore are moot because Philip has, since the initiation of the present action, been given a comprehensive evaluation, received an individual education plan, and been placed in a special education program under the label of "other health impaired." Since the plan and placement are satisfactory to the Moores, and since they have raised no claim for any form of damages or reimbursement, it follows that there

is no longer any live controversy between the Moores and defendants. Their claims must accordingly be dismissed.

Lastly, the persuasive weight of the defendants' respective evidence is deserving of distinct comment and resume. Indeed, an understanding of their response to the EAHCA provides a sound buttress to this decision; and for all of the additional reasons hereinafter expressed, they deserve to prevail.

Defendants have contended throughout this case that both the state's and the school district's special education plans are in compliance with both the letter and the spirit of the EAHCA. Defendants, both through cross-examination of plaintiffs' witnesses and in the presentation of their own case, have convinced the Court that their plans represent a timely, workable, and entirely reasonable response to the mandates of the EAHCA; indeed, the Court believes that defendants have not only met, but exceeded, that Act's requirements.

It is important that the chronology of the EAHCA and the Kansas Special Education Act be kept in mind. The EAHCA was not fully implemented and effective until September 1978, the major implementary regulations being issued by the Federal Office of Education in August 1977; by the same token, the Kansas Act became effective in July 1979. The state's initial plan followed shortly thereafter, and it would be fair to state that during these years—doubtless critical years in the lives of Tony Akers and Philip Moore—the state's and the school district's plans were in a "pilot project" state. In the Court's view, only the defendants' current compliance with the EAHCA is properly at issue; certainly no one should suggest that a remedy exists here for anyone's failure to respond in advance of the Act's mandate. In other words, while Tony Akers and Philip Moore are the victims of the ignorance of an entire community, and of the failings of its educational system, they are not the victims of that system as it is currently structured.

The Court does not doubt that the EAHCA itself is in part the product of agitation from well-intentioned, frustrated, but determined parents such as Madeline Akers and Arlene Moore, and that these parents' efforts on behalf of all handicapped children are deserving of this community's commendation and gratitude. The Court also believes, however, that the State Board of Education and U.S.D. 259 are also deserving of commendation for their respective responses to the problems of students who require and deserve special education, and that these entities are well facilitated and staffed to meet their educational responsibilities. It is the Court's view that each fully accepts the premise that epileptic children are indeed "at risk" for learning disabilities and other educational handicaps.

The Court further notes that the state board, which monitors the special education programs in school districts across the state, is itself monitored by federal authorities in the Department of Education, and that these federal regulators have not voiced substantial criticism of the state's special education efforts. The Court notes as well that the state board has sought consultation in the field of epilepsy, and now has on its advisory board a person eminently qualified in the area; moreover, education students are now exposed to required special education courses whose curricula now include a treatment of epilepsy and its educational aspects. Similar responses are also being undertaken by U.S.D. 259, by example, the recently implemented in-service training workshops on epilepsy organized by the school district in consultation with faculty from the University of Kansas School of Medicine at Wichita. Certainly, no one who followed the evidence in this case could argue that substantial advances have not been made since the early 1970's.

The Court was also impressed with the expertise, dedication, and sincerity of the defendants' witnesses, not the least of whom were the State's Director of Special Education, and both the present and former Directors of Special Education for U.S.D. 259. It is these individuals who developed the state's and district's special education plans, and it is their view, as professional

educators, that initial screening for epilepsy per se is not required, but only screening for educational problems, and the school district concurs in this view. As now implemented, the primary line of screening is achieved through the daily observation of students by their teachers, but the observations of other professionals, the results of educational tests, and other screening devices are also utilized. In the event that suspicions arise in any area, there will be a basis for consultation with parents, and perhaps a referral for additional evaluation by a team who take into consideration the child's health, social, psychological, and educational situation. Once such an evaluation is initiated, the due process protections of the EAHCA are triggered; in any case, the parents have the right to be directly involved at all stages. It certainly occurs to the Court that if reasonable people are attempting to work out a given child's problems, and have access to the many sources of expertise that are now available, reasonable solutions should follow.

That is not to say that "special education" will be the inevitable alternative in any case where a child is having school problems; indeed, in part because that very label may stigmatize a child and restrict his or her future opportunities, the Court perceives that special education is probably the last resort. The present structure assures, however, that if special education is required, labels will be set aside, and the primary concern of all will be the particular educational needs of the individual child. In the final analysis, an individual education program (IEP), setting forth certain educational objectives—an "educational road map" of sorts—will be prepared.

The Court certainly does not mean to suggest that defendants' responses to the educational needs of epileptic children is perfect—only that those responses are workable and appropriate. It is inevitable that any large public institution staffed by fallible human beings and faced with limitations of expertise and budget will continuously reveal its shortcomings. Indeed, the testimony of plaintiffs' rebuttal witnesses established that the ignorance of the past has by no means been eradicated. Many improvements could be made along the lines suggested by plaintiffs in their requests for injunctive relief. In particular, the Court believes that a full scale, community-wide public relations program is in order; every parent, teacher, and physician should observe the film "Images of Epilepsy;" and it seems that the present screening circulars could be improved, at virtually no cost, if they were supplemented by the simple questions suggested by Dr. Masland as a useful means of detecting epileptic children. The Court also observed that Dr. William Svoboda, an eminently qualified pediatric neurologist who specializes in epilepsy, has recently joined the faculty of the University of Kansas School of Medicine at Wichita, and is certainly an asset to the entire community; the Court surmises that since this litigation was commenced Dr. Svoboda has been in consultation with representatives of U.S.D. 259, and certainly hopes that such consultation might continue on a regular and formal basis. Indeed, the transcript of Dr. Svoboda's testimony could well serve as a required text for student teachers, nurses, physicians, *and* the local educational authorities, if for no other reason than as a constant reminder of the plight still faced by epileptic children.

In the final analysis, the Court cannot compel people to respond or listen. But having observed the talent and dedication of defendants' witnesses, the Court is convinced that this very trial was a learning experience for all involved, and will lead to further improvements. Even if no mandate is in order, the Court believes that these defendants, through their most able staffs, heard plaintiffs' evidence as clearly as did this trial judge.

Accordingly, the memorandum set forth above shall be deemed to be findings of fact and conclusions of law as defined under Rule 52 of the Federal Rules of Civil Procedure. In all respects the Court finds that the plaintiffs have failed in their burden of proof as relates to their motions for class certification and injunctive relief.

IT IS, THEREFORE, CONSIDERED, ORDERED, ADJUDGED AND DECREED that the plaintiffs' motion for class certification be denied and the motions for injunctive relief be denied. Costs are assessed to the plaintiffs.